UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRENCE SHAUGHNESSY,

      Plaintiff,

v.                                                                            Case Number: 09-12077
                                                                       Honorable Julian Abele Cook, Jr.

INTERPUBLIC GROUP OF COMPANIES, INC.,

      Defendant.

_____/

## ORDER

This case arises out of a wrongful termination lawsuit by the Plaintiff, Terrence Shaughnessy, who complains that his former employer, The Interpublic Group of Companies, Inc. ("IPG"), retaliated against him for having reported a supervisor's unlawful conduct. On April 23, 2010, the IPG filed a motion to dismiss the complaint because, in its opinion, Shaughnessy had failed to state a viable cause of action under the law, citing to Federal Rules of Civil Procedure 8, 12(b)(6), and the new pleading standards as set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (May 18, 2009). In addition to formally expressing his opposition to the IPG's dispositive motion, Shaughnessy also filed a request for leave to file a first amended complaint. Both of the parties' applications for relief are now before the Court for decisions.

I.

The IPG[1] is a holding company which encompasses thirty eight advertising and/or marketing agencies, including General Motors R*Works ("GM R*Works"), whose sole client is the automotive company, General Motors. During the five years which preceded the commencement of this lawsuit, Shaughnessy had worked with IPG where his work as an at-will employee was rated as outstanding by the Company.

Every year during Shaughnessy's tenure with the IPG, he and his colleagues were required to sign a form on which they would formally acknowledge their awareness and understanding of the written confidentiality and non-solicitation policies of the Company, as well as the substantive content of its Code of Conduct. This Code of Conduct consisted of two parts which collectively outline the policies of the IPG on, *inter alia,* the solicitation of clients, the receipt of gifts, and the prohibition against trading with inside information. The document also included the following relevant clauses:

- A statement in Part 1, which after outlining its policy on confidentiality and non-solicitation, notes that "[n]othing herein shall change the at-will nature of [the employee's] employment relationship with the Company." *Code of Conduct* at 2.

- A preamble to Part 2 which states that the IPG "take[s] pride in a reputation of high moral and ethical standards" and which expresses the Company's commitment to "act with fairness, honesty and integrity" in its business dealings. *Code of Conduct* at 3.

- A preliminary statement in Part 2 about the limitations of the Code of Conduct, including that the document "expresses in general terms the standards of conduct . . . expected of all Company employees in their day-to-day activities and in their relationships with those with whom the Company

---

[1]The word, "Company," may be used interchangeably with the name of Shaughnessy's former employer, the IPG, during the course of this order. Unless the Court states otherwise or it is plainly evident from a reading of the sentence structure, a reader of this order should not assume or attach any significance to the interchange of these words.

does business. . . .[,]" that it "is not a comprehensive document intended to address every legal or ethical issue that [an employee] might face, nor . . . a description of all laws and policies that apply to Company businesses. . . .," and that the Code of Conduct "should be used as a guide and a resource to alert [the employee] to significant legal and ethical issues that frequently arise." *Code of Conduct* at 3.

- A notation that employees with sensitive matters should "feel free" to direct questions to the Human Resources Director or Corporate Legal Department. *Code of Conduct* at 10.

- A statement that "[n]o retaliation will be taken against any employee for raising any concern, question or complaint in good faith," and an assurance that all such matters will be handled confidentially. *Code of Conduct* at 10.

- An indication that the Company established an "Alertline" on which employees could call to report violations of the Code of Conduct or any of its standard policies and procedures. *Code of Conduct* at 9.

The IPG also issued two additional documents, both of which were ostensibly designed to encourage its employees to (1) familiarize themselves with the Code of Conduct, and (2) report any violations of the Code to management. Shaughnessy claims that, while working for Momentum (a subsidiary of the IPG), he learned that his supervisor had, *inter alia,* falsely billed General Motors for personal expenses, stolen the client's property which was subsequently sold on eBay, and misused the client's funds. According to Shaughnessy, he reported this misconduct to the IPG's corporate attorney who, in turn, advised him to notify senior management. Shaughnessy, relying upon the IPG's confidentiality and anti-retaliation policies, reported this alleged misconduct on the Alertline on March 17, 2007 and April 7, 2007.

According to Shaughnessy, the Company's retaliation efforts against him began shortly thereafter, as evidenced by lost job assignments, being reprimanded in the presence of clients and coworkers, and receiving undue scrutiny of his work performance. It is his contention that this form of retaliatory conduct continued and escalated until November 3, 2008, when he was fired. While

acknowledging that Shaughnessy had been fired, the IPG maintains his layoff had been precipitated by an economic reduction in the work force which occurred (1) approximately eighteen months after the supervisor's alleged illegal activity had been reported to the Company management via the Alertline, and (2) nine months after he had been offered a position with GM R*Works.

II.

Shaughnessy seeks leave from the Court to amend his complaint with the addition of a third claim for promissory estoppel, and to further clarify the allegations that had been raised in his initial filing. Under Fed. R. Civ. P. 15(a)(2), a court may "freely give leave [to amend a pleading] when justice so requires." This rule reaffirms the principle that cases should be tried on their merits "rather than [on] the technicalities of pleadings." *Moore v. City of Paducah*, 790 F.2d 557, 559 (6th Cir.1986) (quoting *Tefft v. Seward*, 689 F.2d 637, 639 (6th Cir.1982)). Nevertheless, a court is entitled to consider various factors that weigh in favor of rejecting requests for leave to amend a pleading, such as undue delay, bad faith, or prejudice to the opposing party. *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458 (6th Cir. 2001). If, in the opinion of a court, a proposed amendment will not survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), such a request should be disallowed because of its futility. *Thiokol Corp. v. Dept. of Treasury*, 987 F.2d 376, 382 (6th Cir.1993). Here, the IPG submits that it would be futile for the Court to allow Shaughnessy to amend his complaint, inasmuch as the newly stated claims cannot survive a challenge under Fed. R. Civ. P. 12(b)(6). Fed R. Civ. P. 8(a)(2) requires a complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief [in order to] give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) and

Fed.R.Civ.P. 8(a)(2)). While this pleading standard does not mandate "detailed" factual allegations, it does require more than the bare assertion of legal conclusions. *See Twombly*, 550 U.S. at 555. Therefore, a plaintiff must offer more than "an unadorned, the defendant-unlawfully-harmed me accusation." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).

Generally, when considering a motion to dismiss, a court must construe the complaint in a light that is most favorable to the plaintiff, whose factual allegations must be accepted as true. A court must also draw all reasonable factual inferences in the plaintiff's favor. *Tipton v. Corr. Med. Services, Inc*., No. 08-421, 2009 WL 2135226 (W.D.Mich. July 15, 2009). However, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555). Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Claims are capable of surviving a Rule 12(b)(6) motion only if the "[f]actual allegations [are] enough to raise a right to relief above the speculative level . . . on the assumption that all [of] the allegations in the complaint are true . . . ." *Twombly*, 550 U.S. at 555.

As emphasized by *Iqbal*, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is "plausible" on its face:

> [O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief. *Iqbal*, 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)) (internal citations omitted).

Therefore, in evaluating the IPG's motion for dismissal pursuant to Fed.R.Civ.P. 12(b)(6), the Court is guided by the standard formulated under *Iqbal*.

5

A. <u>Shaughnessy's Claim for Breach of Contract</u> (Count I)

For the purpose of the issue now before the Court, both parties agree that they had a valid and binding employment contract.[2] Michigan courts have adopted a presumption that, with narrow exceptions, those persons who work for an indefinite period of time are considered to be "at-will" employees. *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579 (1980). In order to overcome this presumption, a plaintiff may offer evidence to the contrary, including company policies and procedures that show an intent to convert a position to one with job security which, in turn, authorizes the termination of employment for just cause only. *Dolan v. Continental Airlines / Continental Express,* 454 Mich. 373, 383-84 (1997).

Here, Shaughnessy points to the anti-retaliation provision within the IGP Code of Conduct, which states that "no retaliation will be taken against any employee for raising any concern, question or complaint in good faith." *Code of Conduct* at 10. In advancing this position, he asks the Court to construe this language as a separate binding contract. However, his argument must fail under a proper interpretation of Michigan law.

In *Dolan, supra* the Michigan Supreme Court recognized that it could not, as a matter of law, authorize a breach of contract claim which is based on the mere dissemination of an employee handbook with an implied discharge-for-cause policy within its pages. *Id.* at 386. The court noted that if an employer establishes such a policy, it "may become part of an employment contract only

---

[2]Ordinarily, in order to prevail on a cause of action for breach of contract, a plaintiff would have to initially establish that a valid contract exists between the parties. Once a valid contract has been proven, a plaintiff who seeks to recover for its breach must show that (1) the terms of the parties' agreement require the performance of certain actions; (2) a party violated the terms of the contract; and (3) the breach caused an injury to the other party. *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir.1999).

6

when the circumstances (e.g., the language in the handbook itself, or an employer's oral statements or conduct) clearly and unambiguously indicate that the parties so intended." *Id.* (quoting *Rood v. General Dynamics Corp. et al, v. SPX Corp.,* 444 Mich 107, 137 (1993)). Based on these cases, the IPG contends that this Code of Conduct is a general statement of the Company's policy. Moreover, it submits that this general statement does not have any language which reflects a clear and unambiguous intent to protect employees from retaliatory discharge. A review of the record reveals that as to Shaughnessy's Count I breach of contract claim, the analysis by the IPG is correct.

Part 1 of the Code of Conduct contains a disclaimer which states that nothing therein "shall change the at-will nature of [the employee's] employment relationship with the Company." *Code of Conduct* at 2. Shaughnessy urges the Court to limit the reach of this language to the Company's confidentiality and non-solicitation agreement. Yet, aside from its physical location within this document, there is nothing that expressly restricts the application of the "at-will" clause to Part 1. Moreover, the prefatory language in the Code of Conduct suggests that the IPG intended this document to be a general statement of its policy, rather than a binding contractual agreement. *See Code of Conduct* at 3 (noting that the Code of Conduct "expresses in general terms the standards of conduct . . . expected of all Company employees," that it "is not a comprehensive document intended . . . [as] a description of all laws and policies that apply to Company business" and that it "should be used as a *guide and a resource* to alert [the employee]" to common legal and ethical issues) (emphasis added). Inasmuch as this Code of Conduct does not clearly and unambiguously reflect the intent of the IPG to form an anti-retaliation contract with its employees, Shaughnessy cannot prevail on this issue as a matter of law. Accordingly, the Court must deny Shaughnessy's motion for leave to amend the complaint as to Count I because it cannot survive an application for dismissal

7

under Rule 12(b)(6).

B.     Shaughnessy's Claim for Retaliation In Violation of Michigan Public Policy (Count II)

In Count II of his proposed amended complaint, Shaughnessy seeks to buttress his original claim that he was terminated in violation of an existing public policy. Within certain limited constitutional or statutory boundaries, either party to an employment contract for an indefinite term may end the relationship at any time for any reason whatsoever. *Suchodolski v. Michigan Consolidated Gas Co.*, 412 Mich 692, 695 (1982). Michigan courts have recognized an exception to this general rule based on the notion that "some grounds for discharging an employee are so contrary to public policy as to be actionable." *Id.* Generally speaking, courts have upheld three narrow types of public policy claims, i.e., those where an employee is discharged (1) in violation of an explicit legislative statement prohibiting discharge, discipline, or other adverse treatment for those acting in accordance with a statutory duty or right, (2) for failing or refusing to violate an existing law, or (3) for attempting to exercise a right that had been created by a well-established legislative enactment. *Id.* at 695-696. In his pursuit of this point, Shaughnessy appears to be making an attempt to place his claim within the second and third prongs of the *Suchodolski* test.

As to the assertion that he was discharged for refusing to violate an existing law (*Suchodolski* prong 2), Shaughnessy points to allegations within his proposed complaint that he (1) was aware of "likely felonious conduct by his supervisor," and (2) "could have" been accused of aiding and abetting crime, compounding or concealing offenses and/or acting as an accessory after the fact had the supervisor's misconduct not been disclosed. Even if his arguments were considered, Shaughnessy has not pled any facts from which the Court could infer that (1) the supervisor was aware of Shaughnessy's knowledge of the alleged criminal activity; (2) Shaughnessy was asked to

8

conceal the criminal activity; or (3) Shaughnessy had played any *actual* role in sheltering potentially criminal conduct which could be reasonably construed as an aiding or abetting crime. *See Hein v. All America Plywood Co., Inc.*, 232 F.3d 482, 486 (6th Cir. 2000) (noting that an employee has a valid public policy claim under Michigan law if he was fired because of his failure or refusal to adhere to his employer's request or demand to break the law ). Shaughnessy's claim - standing alone - that he "failed or refused to violate a law"constitutes a mere formulaic recitation of the *Suchodolski* standard, and is insufficient under *Twombly* and *Iqbal, supra.* Because these claims are futile in that they do not cross the line from being merely "possible" to "plausible," Shaughnessy's motion to amend this count must be denied.

In support of his claim that he was discharged "for exercising a right conferred by a well-established legislative enactment" (prong 3 of *Suchodolski*), Shaughnessy cites the Securities and Exchange Regulations, the New York Stock Exchange ("NYSE") Listing Manual, and the Securities Exchange Act, 15 U.S.C. § 7202. In his view, these provisions collectively conferred a right upon him to be protected from retaliation for reporting illegal behavior. Notwithstanding this contention, a closer review of Shaughnessy's claim reveals that it must also fail.

As an initial matter, Shaughnessy has failed to identify any particular Securities and Exchange Commission ("SEC") Regulation which supports his argument. Although he relies in part upon 15 U.S.C. § 7202, this section merely authorizes the SEC to promulgate rules and regulations in furtherance of the Sarbanes-Oxley Act. Furthermore, § 7202 points out that only a violation of the Sarbanes Oxley Act (or any SEC rule or regulation issued thereunder) will be treated as a violation of the Securities and Exchange Act of 1934.

In that regard, Shaughnessy's argument that rules in the NYSE's Listed Company Manual

9

fall within § 7202 is misplaced. It is true that the NYSE rules require such listed companies as the IPG to maintain a code of conduct. It is also true that these rules advise companies to encourage whistle-blowing by informing employees "that the company will not allow retaliation for reports made in good faith." *See NYSE Listed Company Manual* §303A.10. That notwithstanding, Shaughnessy has not proffered any persuasive argument as to why the Court should treat the NYSE manual as a "well-established legislative enactment." *Suchodolski, supra*. To the contrary, as the IPG points out, the NYSE is a self-regulatory organization which is completely separate and distinct from the SEC. Thus, the Court cannot find any logical reason to conclude that a violation of an NYSE rule is the tantamount to a violation of the Securities Exchange Act, and, thus, in contravention of public policy. Inasmuch as Shaughnessy offers no reliable legal authority to support this claim, the Court also rejects this portion of his motion for leave to amend the complaint.

**C.** <u>Shaughnessy's Proposed Claim for Promissory Estoppel</u> (Count III)

Finally, Shaughnessy seeks authority to add a third count for promissory estoppel to his complaint. In order to prevail on this claim, he is legally obliged to establish the following elements: (1) a promise; (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee; (3) that the promise produced a reliance or a forbearance of that nature; and (4) that the claimed reliance or forbearance occurred under circumstances which required an enforcement of the promise, in order to avoid an injustice. *Zaremba Equipment, Inc. v. Harco Nat'l Ins. Co.*, 280 Mich. App. 16, 41 (2008). Furthermore, Michigan courts require that the promise be "definite and clear," and that the reliance by the injured party be reasonable. *Id.*

Here, the proposed amended complaint provides that (1) the IPG "invited [its] employees

to report violations of law or the Code of Conduct" and promised not to retaliate against those persons who made such a report in good faith; (2) the Company reasonably expected the employees to rely upon its promise; and (3) Shaughnessy, after relying upon this promise, was subjected to acts of retaliation and subsequent termination action by his employer. At first blush, Shaughnessy's claim appears to be reasonable under settled Michigan law. In *Rood*, 444 Mich. at 137, the Michigan Supreme Court observed that there is a separate theory which is independent of a traditional contract analysis and serves as a lawful basis upon which Courts may judicially enforce employer policies. This doctrine stems from an employee's "legitimate expectation" that he will not be terminated, based on the relevant language in the policy. *Id.* at 137-139. According to *Rood*, "[t]he first step in analyzing a legitimate expectations claim under *Toussaint*, is to determine, what, if anything, the employer has promised." *Id.* at 139. Once it is determined that a promise has been made, "the second step is to determine whether the promise is reasonably capable of instilling a legitimate expectation of just-cause employment in the employer's employees." *Id.* As such, the courts must review these policies and decide if they can reasonably be interpreted "as promises of just-cause employment." *Id.* At 140. As to this prong, it was noted that "only policies and procedures reasonably related to employee termination are capable of instilling such expectations." *Id.* Citing *Toussaint,* the *Rood* court noted that "having announced the policy, presumably with a view to obtaining the benefit of improved employee attitudes and behavior and improved quality of the work force, the employer may not treat its promise as illusory." *Rood* at 138. However, when applying these principles to the employment documents in this case, it is readily apparent to the Court that Shaughnessy's claim lacks merit.

In its Code of Conduct, the IPG states that "[n]o retaliation will be taken against any

11

employee for raising any concern, question or complaint in good faith." It is true that this language is unequivocal and absolute, containing no exceptions, and relates to the matter of employee termination. Nevertheless, this language cannot be read in isolation from the admonition within the IPG's Code of Conduct's that "[n]othing herein shall change the at-will nature of [the employee's] employment relationship with the Company." *Code of Conduct* at 2. Moreover, as the IPG notes, the existence of a similar disclaimer in Shaughnessy's employment application and the offer letter extinguishes any realistic expectation that the anti-retaliation clause within the Code of Conduct created a separate contract or otherwise modified Shaughnessy's at-will status. Read together, the express language of these documents precludes a finding that the IPG intended to place any limitations upon its ability to terminate its employees, including Shaughnessy. Because he cannot establish that the anti-retaliation provisions amounted to the promise of job security, Shaughnessy's motion to amend his complaint which, if granted, would include a claim of promissory estoppel, must be denied.

## IV.

For the reasons that have been outlined above, the Court will grant the IPG's motion to dismiss the original complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). As to Shaughnessy's motion to amend his complaint, the Court will deny this request in its entirety.

IT IS SO ORDERED.


Dated:  June 28, 2010                                      S/Julian Abele Cook, Jr.
        Detroit, Michigan                                  JULIAN ABELE COOK, JR.
                                                           United States District Court Judge


CERTIFICATE OF SERVICE

12

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on June 28, 2010.

                                                              s/ Kay Doaks
                                                              Case Manager